FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 AUG 11 AM 9: 34



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69852-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDREW SAGGERS, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: August 11, 2014 |
| | ) | |

VERELLEN, A.C.J. — Consistent with the recent decision of the United States Supreme Court in <u>Navarette v. California</u>,[1] a 911 phone call from an unknown caller who gives a contemporaneous eyewitness account of a serious offense presenting an exigent threat to public safety may provide a valid basis for an investigatory (<u>Terry</u>[2]) stop. But here, police officers had good reasons to question the reliability of the 911 call, and any suspicion of an exigent circumstance had dissipated by the time police officers inquired whether Andrew Saggers had a shotgun in his house. Saggers' admission that he had a shotgun in his home and his consent to police to retrieve the shotgun were beyond the scope of a valid <u>Terry</u> stop. Therefore, his conviction for unlawful possession of a firearm must be reversed.

---

[1] ___ U.S. ___, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014).

[2] <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

FACTS

At approximately 2:45 a.m., Officer Shane Walter responded to Kyle

Thompkins' call for civil standby at Saggers' residence. In the phone conversation,

Thompkins told Officer Walter that he was outside of Saggers' house and wanted to

retrieve some items from Saggers' garage. Officer Walter told Thompkins that he

should call back at a more reasonable hour. Thompkins became agitated and "made

some comments about people having guns with domestic violence stuff."[3] But

Thompkins did not directly tell Officer Walter that there was a firearm in the

residence. The call ended around 3:00 a.m.

At 3:13 a.m., a priority call came over the police radio. In a 911 call, a man

who identified himself as Abraham Anderson reported that, five minutes earlier while

walking his dog, he witnessed a man having an argument with a woman over a drug

transaction at the street address of Saggers' residence. The caller reported that the

man hit the woman, went inside, got a shotgun, came back outside and threatened

the woman. He said that the woman drove away in a green Toyota and that there

was a red and grey Suburban truck parked outside of the residence. The caller

stated that he was calling from a gas station approximately a mile away from where

the altercation occurred.

Police immediately responded to the call, and Officer Walter arrived at the

residence at 3:18 a.m. Officers noted that the address given in the 911 call was the

same as the address for the civil standby call, but were not sure how or if the calls

---

[3] Report of Proceedings (RP) (Dec. 18, 2012) at 11.

2

were related. Because the call involved a firearm, they treated it with "the utmost seriousness."[4]

When police arrived at the residence, there was no one outside of the house, all the indoor lights were off, and there was no movement inside. There was a Suburban parked in the driveway, blocked in by another vehicle.

At 3:19 a.m., dispatch advised officers over the radio that while Anderson was at the gas station, he saw the Suburban drive past him and turn around in a restaurant parking lot.

At 3:21 a.m., information came over the radio that an officer tried to contact Anderson at the gas station, but no one was present and the pay phone receiver was hanging by its cord.

The officers discussed whether the same person made the civil standby and 911 calls. Officer Walter thought it was "a distinct possibility" that Thompkins was the 911 caller.[5] Because the caller reported an individual had been injured and a person possessed a shotgun, the officers decided to pursue the investigation.

Police did not want to approach the house by foot and knock on the door since a firearm was potentially involved. When they were unable to contact anyone in the residence by telephone, police decided to activate a patrol car's lights and use the loudspeaker to try to get someone to come to the door.

At 3:44 a.m., after several announcements, Saggers opened the door and complied with all police commands. He exited the house and walked down the driveway. Officer Mills handcuffed him, performed a quick weapons check, and

---

[4] Id. at 20.

[5] Id. at 67.

placed him in a patrol car. Officer Mills told Saggers that he was not under arrest and did read him his Miranda[6] rights. Then Officer Mills left Saggers in the car for a couple of minutes and returned to the house in order to detain anyone else that came out.

Around the same time, other officers entered the house and contacted Saggers' roommate, Eddie, who was asleep. Eddie told police that Thompkins had been by the house earlier asking for Saggers and wanting to retrieve his belongings. Eddie confirmed that no one else had been in the house and that no females had been there. After this conversation, police believed the 911 call was a prank because nothing about Eddie's or Saggers' demeanor supported the original call.

While Officer Mills was away from Saggers, he learned that police "had done a security sweep [of the house] and there was no female inside."[7] He also knew that officers inside the home had contacted Eddie but did not know the content of the conversation with Eddie. Finally, he knew that "[n]obody associated with the house was waving a gun around . . . [o]r was in physical control of a gun"[8]

Officer Mills then returned to the car and questioned Saggers. Saggers told Officer Mills that he believed Thompkins made the 911 call because Thompkins was at the house earlier in the evening demanding to get some of his property out of the garage. Officer Mills also asked specific questions about the alleged altercation:

> I asked [Saggers] if he was in a fight with a woman. He said no.
> A woman had not been there all night. There's no woman in the house.
> He said that he never waved a shotgun at anybody.

---

[6] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[7] RP (Dec. 20, 2012) at 144.

[8] Id. at 146.

> I asked him if he owned a shotgun. He said yes, there is one in his bedroom locked in a case.[9]

After speaking with Saggers, Officer Mills concluded that Saggers was not involved in the altercation reported to 911 and took off the handcuffs. Shortly thereafter, while Saggers was still sitting in the patrol car, Officer Mills learned that Saggers was ineligible to possess a firearm. Officer Mills then asked Saggers for consent to go into the house and retrieve the shotgun. Saggers agreed.

The State charged Saggers with one count of unlawful possession of a firearm in the second degree. Saggers moved to suppress both his statement that he possessed a firearm and the firearm retrieved as a result of the search. At the CrR 3.6 hearing, Saggers argued that reasonable suspicion did not justify his seizure. The trial court found that, based on the total circumstances, there was reasonable suspicion to lawfully detain Saggers and denied his motion to suppress. The trial court then found Saggers guilty in a bench trial on stipulated facts.

Saggers appeals.

## DISCUSSION

Saggers argues that at the time he was interrogated, police did not have reasonable suspicion that a crime had occurred or was about to occur. We agree.

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, a warrantless seizure is considered per se unconstitutional.[10] But an officer may conduct a warrantless Terry stop if he or she has "a reasonable suspicion, grounded in specific and articulable facts, that the

---

[9] Id. at 123.

[10] State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004).

person stopped has been or is about to be involved in a crime."[11] "A reasonable, articulable suspicion means that there 'is a substantial possibility that criminal conduct has occurred or is about to occur.'"[12]

We review de novo whether the State met its burden to justify an investigatory stop.[13] If the initial stop was unlawful or if the police exceed the scope of a valid stop, the evidence discovered during the unlawful portion of that stop is not admissible.[14]

We apply the "total circumstances" test to determine whether an officer had reasonable suspicion warranting an investigatory stop.[15] "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."[16]

Information supplied by another person may authorize an investigative stop if the informer's tip demonstrates some "'indicia of reliability.'"[17] When deciding whether this indicia of reliability exists, the courts will generally consider several factors, primarily (1) whether the informant is reliable, (2) whether the information

---

[11] State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003).

[12] State v. Snapp, 174 Wn.2d 177, 197-98, 275 P.3d 289 (2012) (quoting State v. Kennedy, 107 Wn.2d 1, 6, 726 P.2d 445 (1986)).

[13] State v. Bailey, 154 Wn. App. 295, 299, 224 P.3d 852 (2010).

[14] Kennedy, 107 Wn.2d at 4; State v. Williams, 102 Wn.2d 733, 739, 689 P.2d 1065 (1984) (Terry stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." (emphasis omitted)).

[15] State v. Lee, 147 Wn. App. 912, 916, 199 P.3d 445 (2008).

[16] Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000).

[17] State v. Lesnick, 84 Wn.2d 940, 943, 530 P.2d 243 (1975) (quoting Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)).

was obtained in a reliable fashion, and (3) whether the officers can corroborate any details of the informant's tip.[18]

While known citizen informants are generally presumed to be reliable, the same presumption is not available to anonymous informants.[19] There is also authority that a named but otherwise unknown citizen informant is not presumed to be reliable, and a report from such an informant may not justify an investigative stop.[20]

Even if an informant is unreliable, an officer's corroborating observation of illegal, dangerous or suspicious activity can justify an investigative stop.[21] A police officer may rely on his or her experience to identify seemingly innocent facts as

---

[18] Id. at 944 (quoting State v. Lesnick, 10 Wn. App. 281, 285, 518 P.2d 199 (1973)); Kennedy, 107 Wn.2d at 7; State v. Sieler, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980). The existing standard does not require all three factors to establish indicia of reliability. State v Marcum, 149 Wn. App. 894, 904-05, 205 P.3d 969 (2009) (noting that requiring both a showing that the informant is reliable and that the tip includes sufficient objective facts to justify detention is a direct paraphrasing of the Aguillar/Spinelli standard that does not apply under the total circumstances test for investigatory stops (citing Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969))).

[19] State v. Gaddy, 152 Wn.2d 64, 72-73, 93 P.3d 872 (2004); State v. Wakeley, 29 Wn. App. 238, 241, 628 P.2d 835 (1981).

[20] Sieler, 95 Wn.2d at 48 ("The reliability of an anonymous telephone informant is not significantly different from the reliability of a named but unknown telephone informant. Such an informant could easily fabricate an alias, and thereby remain, like an anonymous informant, unidentifiable."); see also State v. Hopkins, 128 Wn. App. 855, 858-59, 117 P.3d 377 (2005) (despite the general presumption that a citizen informant is reliable, providing the name and cell phone number of an informant unknown to officers is insufficient to establish reliability and cannot by itself justify an investigative stop).

[21] Lesnick, 84 Wn.2d at 944.

suspicious.[22] But confirming a subject's description, location, or other innocuous facts generally does not satisfy the corroboration requirement.[23] The goal of corroboration is to reduce the chance of acting on a malicious prank initiated at the defendant's expense.[24]

Under the total circumstances test, we consider "the particular circumstances facing the law enforcement officer," including the seriousness of the offense and any threat to public safety.[25] Officers investigating reports of emergent risks of imminent violence do not have the opportunity to make detailed inquiries to establish the

---

[22] State v. Moreno, 173 Wn. App. 479, 492-93, 294 P.3d 812, review denied, 177 Wn.2d 1021, 304 P.3d 115 (2013).

[23] See Lesnick, 84 Wn.2d at 943 (the fact that informant accurately described the defendant's vehicle is not sufficient corroboration for a stop); Hopkins, 128 Wn. App. at 858 (investigatory stop not justified where police observed a man who resembled the informant's description at the described location but did not observe a gun or any illegal, dangerous, or suspicious activity); State v. Hart, 66 Wn. App. 1, 9, 830 P.2d 696 (1992) (officer's observation of defendant confirming informant's description and defendant's location did not satisfy the corroboration requirement); Campbell v. Dep't of Licensing, 31 Wn. App. 833, 834-35, 644 P.2d 1219 (1982) (anonymous motorist's tip that a drunk driver was travelling in the opposite direction and description of the car did not justify investigative stop of car matching the motorist's description).

[24] See Florida v. J.L., 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000) (an unknown informant is less reliable because her reputation cannot be assessed and she cannot be held responsible if her allegations turn out to be fabricated); Hopkins, 128 Wn. App. at 864-65 (acknowledging that J.L. held that an anonymous tip indicating possession of a weapon alone did not justify an investigatory stop because such a rule would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search).

[25] Lesnick, 84 Wn.2d at 944 ("[N]o single rule can be fashioned to meet every conceivable confrontation between the police and [a] citizen. . . . [E]ach case must be considered in light of the particular circumstances facing the law enforcement officer. In this case, the suspected crime . . . posed no threat of physical violence or harm to society or the officers."); State v. Franklin, 41 Wn. App. 409, 412-13, 704 P.2d 666 (1985) ("courts have recognized the need for an immediate investigatory stop when an anonymous informant of undetermined reliability states that he or she observed a suspect carrying or displaying a gun in a public place.").

veracity or vantage point of individuals reporting suspicious activity.[26] Accordingly, where police are called upon to swiftly respond to a significant threat to public safety, a court must apply a less stringent standard to assess the reasonableness of the officers' actions than in cases involving no such threat.[27] This rule is soundly based on "the very clear, basic premise" that investigative detentions "will necessarily be judged in light of their particular facts,"[28] and reflects that "the seriousness of the criminal activity reported by an informant can affect the reasonableness calculus which determines whether an investigatory detention is permissible."[29] An anonymous tip as to the presence of a firearm in public alone, without corroboration, is insufficient for an investigatory stop,[30] but a report of actual or threatened use of a firearm can present a significant risk to public safety supporting an investigatory stop without further indicia of reliability.[31]

The United States Supreme Court's recent decision in <u>Navarette</u> illustrates the application of these principles to a 911 call. There, an anonymous 911 caller reported that a pickup truck ran the southbound caller off of a highway at mile marker

---

[26] State v. Randall, 73 Wn. App. 225, 230, 868 P.2d 207 (1994) ("An officer acting on a tip involving the threat of violence and rapidly developing events does not have the opportunity to undertake a methodical, measured inquiry into whether the tip is reliable.").

[27] See Lesnick, 84 Wn.2d at 944-45; Randall, 73 Wn. App. at 230.

[28] Lesnick, 84 Wn.2d at 945.

[29] Sieler, 95 Wn.2d at 50 (citing id. at 944-45).

[30] J.L., 529 U.S. at 272-73.

[31] State v. Cardenas-Muratalla, 179 Wn. App. 307, 313, 319 P.3d 811 (2014); see also 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(i) n.543 at 811-12 (5th ed. 2012) (summarizing lower court cases that have distinguished J.L. in dealing with anonymous tips regarding the actual or threatened use of firearms and other ongoing emergencies or exigent circumstances).

88.[32] The caller identified the make, model, and license plate number of the truck.[33] At 3:47 p.m., the information was broadcast to police officers.[34] At 4:00 p.m., an officer heading northbound passed the truck near mile marker 69.[35] At about 4:05 p.m., after making a U-turn, he pulled the truck over.[36] A second officer, who had separately responded to the broadcast, also arrived on the scene.[37] As the two officers approached the truck, they smelled marijuana.[38] A search of the truck bed revealed 30 pounds of marijuana.[39] The officers arrested the driver and the passenger.[40]

The defendants argued that the traffic stop violated the Fourth Amendment because the officer lacked reasonable suspicion of criminal activity.[41] The Supreme Court disagreed, holding that although it was a "close case," under the totality of the circumstances, the indicia of reliability in the case were sufficient to provide reasonable suspicion to support the traffic stop.[42] Although the tip was anonymous, the Court held that it was sufficiently reliable because the caller claimed contemporaneous, eyewitness knowledge of the alleged dangerous driving and used

---

[32] Navarette, 134 S. Ct. at 1686.

[33] Id.

[34] Id. at 1687.

[35] Id.

[36] Id.

[37] Id.

[38] Id.

[39] Id.

[40] Id.

[41] Id.

[42] Id. at 1692.

the 911 emergency system, which records calls and can be used to later identify tipsters.[43] In addition, the Court held that the behavior identified by the caller was a significant indicator of drunk driving, giving the police immediate reasonable suspicion to pull the driver over "because allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences."[44] Although the Court determined that police did not have to personally observe suspicious conduct during the five minute period they followed the vehicle, it acknowledged that "[e]xtended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication."[45]

Here, we consider the totality of the circumstances standard as applied in Navarette, but we conclude that the police did not have adequate indicia of reliability to continue to question Saggers once the exigent circumstances had dissipated.

Unlike Navarette, several facts undercut the reliability of the 911 call from "Anderson." The 911 call was early in the morning and just 13 minutes after Thompkins' civil standby call regarding the same address. The police officers were distinctly aware of the possibility that Thompkins was the actual 911 caller. Although the 911 caller provided the name "Abraham Anderson" and a birth date, police did not know who he was.[46] The 911 call was made on a pay phone, and when an

---

[43] Id. at 1689.

[44] Id. at 1691-92.

[45] Id. at 1691.

[46] Although Navarette analyzes the 911 call as anonymous, the Court recognized that the caller gave her name. Id. at 1688 & 1687 n.1. Because neither the caller nor the 911 dispatcher testified at the suppression hearing, the prosecution did not introduce the recording into evidence and treated the tip as anonymous. Id. at 1687 n.1.

11

officer arrived at the gas station, just eight minutes after the 911 call was placed, there was no one present and the phone was dangling by its cord.

Despite the questions of Anderson's reliability, the Terry stop may still have been reasonable based upon an emergent risk of imminent violence. Anderson claimed that he saw a man hit a woman and then threaten the woman with a shotgun on the front porch. It is understandable that police pursued the investigation of such a potentially significant threat to public safety even though the officers had no way to make any further inquiries into Anderson's identity or reliability.[47] But by the time Officer Mills questioned Saggers, he knew that Saggers was unarmed, no weapons were apparent, and there were no victims in or around the house.[48] Any initial reasonable suspicion based upon exigent circumstances dissipated before he asked Saggers if he had a shotgun.[49]

---

[47] See Randall, 73 Wn. App. at 230 ("officer acting on a tip involving the threat of violence and rapidly developing events does not have the opportunity to undertake a methodical, measured inquiry into whether the tip is reliable").

[48] The 911 caller indicated that the victim had driven away. The caller later relayed that he saw the Suburban driving past the gas station. It appears that this information was provided about the same time that the officers arrived at the house and saw the Suburban in the driveway blocked in by another car. Although the timeline was confused, officers considered the possibility that there had been a delay in relaying the update. If the officers were concerned that the woman may have returned to the residence or that any other victim was at risk, that concern was dispelled after the officers searched the residence and surrounding area and found no victim.

[49] This is consistent with holdings in other situations where the dissipation of exigent circumstances required police to obtain a search warrant. See Com. v. Kaupp, 453 Mass. 102, 107, 899 N.E.2d 809 (2009) ("The exigency [that evidence would be destroyed] necessitating [a computer's] seizure dissipated once the computer had been secured, requiring the police to seek a search warrant to conduct a forensic analysis of [its] contents."); State ex rel. Adkins v. Dingus, 232 W. Va. 677, 753 S.E.2d 634, 644 (2013) ("When the exigent circumstances allowing police to search and seize a person's property without a warrant dissipate, so does the right of the police to continue its search and seizure."), cert. denied, 134 S. Ct. 2827 (2014);

Contrary to the State's assertion, Anderson is not a presumptively reliable citizen informant. He was completely unknown to the police, called from a pay phone that was not traceable to him personally, and he disappeared after making the call. Under all these circumstances, he could have easily fabricated the information in his 911 call. He was not presumptively reliable.[50]

The State also argues that Anderson was reliable because he claimed to be an eyewitness to criminal activity and police were able to corroborate that a Suburban was parked at the residence.[51] But although the 911 caller claimed to be an eyewitness to the altercation, officers were not able to corroborate the presence of criminal activity once they arrived at Saggers' residence five minutes after the 911 call. There was no one outside, the lights were off, and no movement could be seen inside of the residence. As recognized in Navarette, eyewitness observations and corroboration of details can be important indicia of reliability.[52] But under the total

---

United States v. Murphy, 516 F.3d 1117, 1121 (9th Cir. 2008) (in a warrantless search such as a protective sweep, "once the exigencies of the initial entry have dissipated, the police must obtain a warrant for any further search of the premises"), abrogated on other grounds by Fernandez v. California, 134 S. Ct. 1126, 134 S. Ct. 1126, 188 L. Ed. 2d 25 (2014).

[50] The State argues that Anderson was a presumptively reliable citizen informant and not an anonymous informant subject to a reliability analysis but does not address the case law indicating that an unknown citizen informant may pose the same risks as an anonymous informant because he or she could easily fabricate an alias and remain unidentifiable. See Sieler, 95 Wn.2d at 48; Hopkins, 128 Wn. App. at 858-59.

[51] The State's list of corroborating evidence also includes that someone at the residence owned a shotgun and had a prior history with domestic violence. But this information was based on comments by Thompkins to Officer Walter during the civil standby call about "people having guns with domestic violence stuff." RP (Dec. 18, 2012) at 11. Thompkins did not directly state that there was a firearm in the residence or elaborate on the domestic violence accusation.

[52] Navarette, 134 S. Ct. at 1689.

circumstances here, the eyewitness nature of the 911 call and the presence of the Suburban did not establish reasonable suspicion independent of any exigent circumstances.

Finally, similar to the Supreme Court's discussion in Navarette, the State argues that informants are more reliable when they call 911 because there is a chance those calls are recorded and the caller could be later identified by voice. In Navarette, the Supreme Court acknowledged that 911 calls are not "per se reliable."[53] Its discussion of reliability includes the observation that the Federal Communications Commission requires cellular phone carriers to report a caller's phone number and geographic location to 911 dispatch, making the caller more readily identifiable.[54] Unlike Navarette, Anderson called from a pay phone at a gas station that was in no way connected to him, and he disappeared before police could contact him in person. But even accepting Navarette's apparent increased presumption of reliability from the use of a 911 system, that factor does not tip the total circumstances scales to justify continuing the investigative stop after any exigency had dissipated.

In light of our decision on the issue of reasonable suspicion, it is unnecessary to address Saggers' alternative arguments for reversal.

### CONCLUSION

Under the total circumstances test, a 911 phone call from an unknown caller who gives a contemporaneous eyewitness account of a serious offense presenting an exigent threat to public safety may provide a valid basis for a Terry stop. It is also

---

[53] Id. at 1690.

[54] Id.

understandable that officers faced with such a report would pursue an investigation. But here, police officers had good reason to question the reliability of the 911 call, and any suspicion of an exigent circumstance dissipated before an officer inquired whether Saggers had a shotgun in his house. The State does not establish that Saggers' admission that he had a shotgun in his home and his consent to police to retrieve the shotgun were within the scope of a valid Terry stop.

We reverse the conviction of unlawful possession of a firearm.

WE CONCUR:

_____        _____

_____        _____
Appelwick, J.                   Becker, J.