FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MAY 15, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MAY 15, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CITY OF WENATCHEE, | No. 102680-3 |
| Petitioner, | EN BANC |
| v. | |
| FRANK EDWARD STEARNS, | File: May 15, 2025 |
| Respondent. | |

STEPHENS, C.J.—Every day across Washington, people call 911 to report suspected criminal activity and police are dispatched to follow up. Courts recognize that the reliability of such calls or "tips" cannot be taken for granted. False reports, whether intentionally made or resulting from human bias or misperception, can lead to privacy violations and threaten public safety. We therefore require that police establish the reliability of a tip before using it as basis for reasonable suspicion or probable cause justifying a search or seizure. This case provides an opportunity to clarify our analysis, in particular the distinction between the tipster's basis of knowledge and the tip's factual basis.

Police stopped Frank Edward Stearns on suspicion of driving under the influence (DUI) after a 911 caller reported that he seemed drunk and was "staggering all around the place" in a parking lot. Clerk's Papers (CP) at 17. The trial court found the stop to be justified but the reviewing courts reversed.

We hold that this stop was lawful. The tip received in the 911 call was reliable because the caller was a bystander giving a contemporaneous eyewitness report of DUI to the emergency line, and the officer's observations of Stearns's driving corroborated the caller's report. Additionally, the caller's description of Stearns staggering all around the place both before and after driving, combined with the officer's observations of erratic driving, provided a sufficient factual basis for reasonable suspicion of DUI. Accordingly, we reverse the Court of Appeals and reinstate Stearns's convictions.

FACTS

On July 12, 2019, the Wenatchee Police Department received a 911 call about an incident in the parking lot of Cascade Motorsports on Worthen Street.[1] The caller, David Gilliver, reported that a man "seemed very drunk" and was "staggering all

---

[1] The record does not contain a transcript of the call or dispatch notes, so details of the call are taken from Officer BrinJones's police report and her testimony at the suppression hearing. Officer BrinJones does not specifically describe this as a 911 call in her testimony or report, but both parties and all courts have referred to it as a 911 call at all levels of appeal. *See, e.g.*, Pet. for Rev. at 10; Answer to Pet. for Rev. at 2; *City of Wenatchee v. Stearns*, No. 38981-2-III, slip op. at 2 (Wash. Ct. App. Nov. 28, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/389812_unp.pdf.

around the place." CP at 17. Gilliver said that the man got inside his black crew cab truck and drove it in the parking lot, got out of the truck and staggered again, and got in his truck once more. He described this man as white and 35 years old, wearing a gray hat, blue shirt, and jeans.

Officer Natalie BrinJones was dispatched to respond to the 911 call around 6:39 PM, and she reached the scene within a minute or two. She approached Gilliver, who was standing next to his own black crew cab truck. As she got out of her car to contact Gilliver, he pointed to the other black truck, which was about to pull out of the parking lot, and said something to the effect of "'That's him! He's wasted!'" CP at 17.

Officer BrinJones could see through the open driver's side window of the truck pulling out of the parking lot that its driver fit the description in the 911 call. She promptly started to follow the truck but, due to heavy traffic, ended up about four cars behind the truck on Worthen Street. She could still see the truck and saw it weave toward the center line, but she was too far behind to see whether it actually crossed the center line. She also noticed the truck continued to gain distance from her while she was traveling near the speed limit, leading her to believe the driver was speeding. Her patrol vehicle was not equipped with radar, and she did not pace the truck or otherwise directly measure its speed.

In order to pass the cars between her and the truck, Officer BrinJones activated her emergency lights, but she deactivated the lights before she was directly behind the truck.[2]  She continued to follow the truck through a roundabout, the design of which requires drivers to curve to the left while proceeding around the roundabout and then curve to the right when exiting the roundabout onto a street.  She observed the truck almost hit the curb while exiting the roundabout but jerk at the last second to correct its angle.  She did not observe the truck's tires actually hit the curb or cross the center line.

Shortly after exiting the roundabout onto Riverside Drive, the truck appeared to Officer BrinJones to begin pulling over.  While the truck was stopping, Officer BrinJones observed that the top brake light of the truck did not illuminate.  She activated her emergency lights in order to effect a traffic stop.  The truck then began driving forward on Riverside Drive again, continued for roughly 50 feet, and pulled into a parking lot.  As it did so, Officer BrinJones observed both of the truck's driver side tires roll over the curb.  Now joined by Officer Graves in a car behind her, she followed the truck and watched as it drove into two parking spots and pulled forward so much that its front end was on the curb, blocking the sidewalk.

---

[2] Stearns concedes that this use of emergency lights did not constitute a seizure because Officer BrinJones was far enough behind his truck when she deactivated the lights that he would not have reasonably believed he was being pulled over.  Verbatim Rep. of Proc. (Sept. 19, 2019) at 42.

The driver of the truck, Stearns, exited and began walking toward the officers. Officer BrinJones commanded Stearns to show her his hands, and he "looked confused at first." CP at 18. He stumbled as he walked toward her and then put his hands in the air. Officer Graves approached Stearns and handcuffed him, and Officer BrinJones informed Stearns that he was under arrest for failure to obey a police officer. She immediately noticed "an overwhelming odor of intoxicants"; "bloodshot, watery, and droopy" eyes; and speech "so slurred [she] could barely understand him." *Id.* at 18-19. A search of Stearns's name revealed that he had a suspended license and was required to drive with an ignition interlock device; officers did not find such a device in his truck. Stearns was taken to jail, and roughly 1 hour and 40 minutes after the 911 call, he provided breath samples that measured his blood alcohol content at over three times the legal limit for DUI.

PROCEDURAL HISTORY

Stearns was charged with DUI, failure to obey a police officer, operating a motor vehicle without a required interlock device, and driving with a suspended license in the third degree. He moved to suppress evidence from the traffic stop, arguing that the stop was not supported by reasonable suspicion of DUI. At the evidentiary hearing, the city noted the faulty brake light as part of the totality of circumstances providing reasonable suspicion to stop Stearns. The district court denied the motion, acknowledging that it was a "close one." Verbatim Rep. of Proc.

(Oct. 8, 2019) at 97. It held that the stop was supported by reasonable suspicion of DUI and that the faulty brake light alone would have provided independent reasonable suspicion for a stop. Following a bench trial on stipulated facts, Stearns was convicted of all charges except driving with a suspended license.

Stearns appealed, arguing that the district court erred in denying the suppression motion, and the superior court reversed his convictions. While the court found sufficient evidence supported the district court's findings, it concluded the traffic stop was unlawful for lack of reasonable suspicion. The court held that the circumstances did not establish the reliability of the 911 caller's tip, Officer BrinJones did not sufficiently corroborate the tip, and the faulty brake light was not an independent basis for the stop.

The city moved for discretionary review in the Court of Appeals. The Court of Appeals granted review as to reasonable suspicion of DUI, but denied review as to the determination that the faulty brake light was not an independent basis for the stop. In a split, unpublished opinion, the Court of Appeals affirmed. *City of Wenatchee v. Stearns*, No. 38981-2-III, slip op. at 1 (Wash. Ct. App. Nov. 28, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/389812_unp.pdf.

The city petitioned for review, arguing that the Court of Appeals analysis of the reliability of the 911 call conflicts with our decision in *State v. Z.U.E.*, 183 Wn.2d 610, 352 P.3d 796 (2015), which involved a 911 caller who reported a 17-year-old

in possession of a firearm. We granted review and accepted amicus briefing from the Washington Association of Criminal Defense Lawyers (WACDL) and the Washington State Patrol.

ANALYSIS

"Warrantless seizures are presumed unreasonable" under both article I, section 7 of the Washington State Constitution and the Fourth Amendment to the United States Constitution, "and the State bears the burden of establishing that the seizure falls within one of the carefully drawn exceptions to the warrant requirement." *Z.U.E.*, 183 Wn.2d at 617. One exception is for brief investigative stops, also known as "stop and frisk" or "*Terry*[3] stops." *State v. Acrey*, 148 Wn.2d 738, 746, 64 P.3d 594 (2003). This type of stop "is permissible whenever the police officer has a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *Id*. at 747. "[C]ourts consider the totality of the circumstances" to determine whether a stop is supported by reasonable suspicion. *Id*. We review conclusions of law relating to the suppression of evidence de novo. *Id.* at 745.

When reasonable suspicion is based on an informant's tip, "the State must show that the tip bears some 'indicia of reliability' under the totality of the circumstances." *Z.U.E.*, 183 Wn.2d at 618. These indicia or reliability take the form

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

of either "(1) circumstances establishing the informant's reliability" or "(2) some corroborative observation, usually by the officers, that shows either (a) the presence of criminal activity or (b) that the informer's information was obtained in a reliable fashion." *Id.* (citing *State v. Sieler*, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980); *State v. Lesnick*, 84 Wn.2d 940, 944, 530 P.2d 243 (1975)). The informant's veracity and their basis of knowledge are not strictly necessary elements of proof, but we have acknowledged these considerations "are helpful to the reliability inquiry." *Id.* at 620. Although our analysis of reliability follows the same framework as Fourth Amendment law, "our state constitution generally requires a stronger showing by the State." *Id.* at 618. At the same time, we have recognized that "when a tip involves a serious crime or potential danger, less reliability may be required for a stop than is required in other circumstances." *Id.* at 623.

We have long expressed caution in allowing intrusions into private affairs based on tips, even those from reliable informants. No matter how reliable it is, the State generally may not base a search or seizure on a "tip which is merely a bare conclusion unsupported by a sufficient factual basis." *Sieler*, 95 Wn.2d at 48. This requirement helps prevent privacy violations resulting from a tip from "an honest informant who misconstrued innocent conduct." *Id.* Still, a "conclusory allegation" in a tip may be sufficient if "it is corroborated" under the second or third criterion of the reliability analysis. *Id.* at 48 n.1. This is likely because the corroborating

observations independently supply the articulable facts for reasonable suspicion, not because having a factual basis for the conclusion of criminal activity ceases to be an important safeguard of private affairs.

As our analysis has developed in the case law, we have, at times, used the phrase "factual basis" in a way that appears interchangeable with "basis of knowledge." For example, in *Z.U.E.*, we resolved a split in the Court of Appeals by holding that a tipster's veracity and basis of knowledge are helpful but not necessary elements to find that a tip is reliable. 183 Wn.2d at 620. In doing so, we noted that the tip in *Lesnick* "lacked both veracity and factual basis" when the tipster refused to identify himself and did not provide any information about the source of his knowledge. *Id.* at 619. Our holding that the stop was unlawful did not turn on reliability, though. We ultimately concluded that even if the 911 call was reliable, the tip contained no factual basis for believing the defendant was 17 as opposed to 18 years old—the key fact making the alleged activity criminal. *Id.* at 622-23.

Uncertainty as to the difference between "basis of knowledge" and "factual basis" is understandable because in many cases the informant's tip lacks both a basis of knowledge and a factual basis for the same reason. However, imprecise use of these terms has caused litigants and courts to often conflate them. *See, e.g.*, Pet. for Rev. at 5-6 (arguing that the Court of Appeals erred in making "factual basis" a necessary element); *State v. Smith*, No. 49998-3-II, slip op. at 11-12 (Wash. Ct. App.

Oct. 2, 2018) (unpublished) (Maxa, J., dissenting) (criticizing majority for finding tipster had reliable basis of knowledge but ignoring tipster's lack of factual basis for thinking defendant was engaged in criminal activity), https://www.courts.wa.gov/opinions/pdf/D2%2049998-3-II%20Unpublished%20Opinion.pdf.

We take this opportunity to clarify the definition of both terms and how they fit into our analysis of reasonable suspicion. "Factual basis" refers to the requirement for all *Terry* stops that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21. Factual basis is always necessary to establish reasonable suspicion arising from a tip, whether the facts come from details in the tip itself, corroborating observations, or some combination thereof. "Basis of knowledge" refers to how the tipster gathered their facts, such as through their own senses (e.g., sight, sound, smell) or through a particular means or intermediary (e.g., eavesdropping, looking through binoculars or at the reflection in a mirror, hearing from a friend). As we reaffirmed in *Z.U.E.*, basis of knowledge need not be shown in order to establish reasonable suspicion so long as the totality of the circumstances indicate the tip's reliability.

Applying that analysis here, we consider whether Gilliver's tip was reliable, and then turn to whether Officer BrinJones had a sufficient factual basis for reasonable suspicion of DUI.

I. The tip was reliable because Gilliver was a bystander reporting to 911 his personal observations of an active DUI as it happened, and Officer BrinJones's observations corroborated his report

The circumstances surrounding a tip and the way it is communicated can indicate its reliability. *Z.U.E.*, 183 Wn.2d at 622. Many of the factors present here were found in *Z.U.E.* to "bolster the reliability of the tip": "the relayed call was made by a citizen eyewitness, it was made contemporaneous to the unfolding of the events, [and] it came through an emergency 911 line rather than the police business line." *Id.*; *see also Navarette v. California*, 572 U.S. 393, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (holding that same factors supported reliability of anonymous tip).

Citizen informants[4] "are deemed presumptively reliable." *State v. Gaddy*, 152 Wn.2d 64, 73, 93 P.3d 872 (2004) (citing *State v. Wakeley,* 29 Wn. App. 238, 241, 628 P.2d 835, *review denied,* 95 Wn.2d 1032 (1981)). On the other hand, we have said that anonymous informants are typically unreliable. *See Lesnick*, 84 Wn.2d at 944. In *Sieler*, we held that "the reliability of an anonymous telephone informant is

---

[4] We use the term "citizen informant" to mean a bystander who appears uninvolved in the crime they are describing, as opposed to someone connected with the events, such as a confidential informant. We do not intend to make any distinction based on status as a United States citizen, nor do we read any prior cases using this term to have done so.

11

not significantly different from the reliability of a named but unknown telephone informant." 95 Wn.2d at 48. These statements in *Lesnick* and *Sieler* should be considered in historical context. They predate the technological advancements of modern 911 systems, which allow law enforcement to identify caller location and identity, for example based on cellular data. Considering these systems, recent decisions have repeatedly held that 911 calls are more reliable precisely because callers risk losing their anonymity and can be held accountable for false reports. *See, e.g.*, *Z.U.E.*, 183 Wn.2d at 621; *Navarette*, 572 U.S. at 399; *State v. Howerton*, 187 Wn. App. 357, 371-72, 348 P.3d 781 (2015); *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004); *accord State v. Hopkins*, 128 Wn. App. 855, 869 n.9, 117 P.3d 377 (2005) (Quinn-Brintnall, C.J., dissenting) (citing cases across five states and two federal circuits holding that 911 calls have heightened reliability). This does not mean that courts treat all 911 calls as presumptively or per se reliable without further scrutiny. *See, e.g.*, *State v. Saggers*, 182 Wn. App. 832, 844, 332 P.3d 1034 (2014) (distinguishing *Navarette* and holding tip unreliable because 911 call was made on a pay phone and "officers were distinctly aware of the possibility" that defendant's disgruntled acquaintance was the actual caller).

Stearns in his supplemental briefing and WACDL in their amicus briefing urge us to explicitly hold that the dissent in *Navarette* is more consistent with Washington law than the majority. *See also Z.U.E.*, 183 Wn.2d at 626-30 (Gordon

McCloud, J., concurring) ("[A]rticle 1, section 7 compels us to adopt a standard as protective as the one that the *Navarette* dissent adopted."). They argue that the fact a call is made to the emergency line has no bearing on its reliability because callers are unaware of the technological advancements behind modern 911 systems. They also argue that even if modern 911 calls are more reliable because callers know that technology can identify them and that they can be held accountable for false statements, this reliability is undermined by the possibility that a caller will borrow or steal another person's device to make the 911 call. These arguments highlight important questions about how much the average person knows about 911 technology or how often people use other's phones to report crimes. Without a factual record that implicates these questions and full briefing on both sides, we decline to address whether the *Navarette* majority or dissent approach is more consistent with Washington law. It is sufficient to observe that the officers here were not aware of any circumstances suggesting Gilliver gave a fake name, used another person's cell phone, or had any motive to make a malicious and fraudulent 911 call against Stearns.

A citizen informant's reliability is further enhanced when they are an eyewitness and when they report their tip contemporaneously or immediately after the events they describe. *See State v. Lee*, 147 Wn. App. 912, 918, 199 P.3d 445 (2008); *Howerton*, 187 Wn. App. at 370; *Navarette*, 572 U.S. at 400-01. Police may

not simply assume that an informant is an eyewitness or that their report is contemporaneous, though this may often be inferred from the circumstances. *See Howerton*, 187 Wn. App. at 369 (citing *State v. Vandover*, 63 Wn. App. 754, 759-60, 822 P.2d 784 (1992)). Here, Gilliver's call contained visual descriptions of Stearns's appearance and described Stearns's actions as they unfolded. When Officer BrinJones arrived only a few minutes after the call, Stearns was just pulling out of the parking lot and Gilliver pointed to Stearns's truck, exclaiming something to the effect of "'That's him! He's wasted!'" CP at 17. This further suggests that Gilliver had been describing his personal observations of Stearns's recent actions inside the parking lot as they occurred, a fact that weighs in favor of his tip's reliability.

The reliability factors mentioned in *Z.U.E.* and *Navarette* should also be considered in the context of our evolving understanding of human behavior, which necessarily informs the reasonable inferences to be drawn. These factors generally parallel the hearsay exceptions in evidence law, which are also aimed at establishing the reliability of a statement from the circumstances in which it was made and reflect long held assumptions about witness credibility. *See, e.g.*, *Navarette*, 572 U.S. at 400 (analogizing to present sense impression and excited utterance hearsay exceptions); *State v. Morrell*, 16 Wn. App. 2d 695, 703, 482 P.3d 295 (2021) ("A statement against interest can help establish a criminal informant's credibility . . .

.”); *see also* Andrew B. Kartchner, J.L.*'s Time Bomb Still Ticking: How* Navarette*'s Narrow Holding Failed to Address Important Issues Regarding Anonymous Tips*, 44 U. BALT. L. REV. 1, 5 (referring to this concept as "observational reliability" and citing cases discussing it as such). Our past descriptions of informants build on these assumptions and describe the contrast between professional informants on the one hand, who are motivated by the concessions offered to them by law enforcement, and citizen informants, who are motivated solely by their desire to report events to authorities, justifying an inference of reliability. *Z.U.E.* and *Navarette* built further on this contrast by recognizing that 911 callers are often, but not always, citizen informants rather than professional informants. Neither case considered the possibility of a citizen informant whose motivation and perceptions are colored by unconscious bias.

Our awareness of unconscious biases has developed in the years since *Z.U.E.* and *Navarette*. *See* Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. at 2 (June 4, 2020) (urging members of the judiciary and legal profession to "develop a greater awareness of our own conscious and unconscious biases in order to make just decisions in individual cases"), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7]. Even when a 911 caller is not motivated by malice

15

and reports a crime that they genuinely believe to be occurring, courts must consider the possibility that implicit bias caused them to misconstrue the behavior they observed as criminal. *Cf., e.g.*, *State v. Jefferson*, 192 Wn.2d 225, 249-50, 429 P.3d 467 (2018) (requiring courts to ask whether objective observer aware of implicit bias could view race as a factor in the use of peremptory challenge); *State v. Zamora*, 199 Wn.2d 698, 718-19, 512 P.3d 512 (2022) (applying same test to claims that prosecutor appealed to juror bias). In particular, courts must be aware of the prevalence of 911 calls urging police to investigate Black people for "all kinds of daily, mundane, noncriminal activities" that the caller alleges constitute a crime or a threat to their safety. *See* Brandon Griggs, *Living While Black*, CNN (Dec. 28, 2018, 8:37 AM), https://www.cnn.com/2018/12/20/us/living-while-black-police-calls-trnd/index.html [https://perma.cc/S94A-KK3V]; *see also* Sarah Maslin Nir, *White Woman Is Fired After Calling Police on Black Man in Central Park*, N.Y. TIMES (Feb. 16, 2021), https://www.nytimes.com/2020/05/26/nyregion/amy-cooper-dog-central-park.html. Courts can better safeguard private affairs not by removing from consideration the fact that a tip came from a citizen informant making a 911 call but, rather, by adding consideration of unconscious bias to the totality of circumstances.

Recognizing the need to carefully consider the impact of implicit bias in every case, there is no suggestion here that it impacted the reliability of Gilliver's tip, which made no overt or implicit reference to Stearns's race aside from a simple

visual description and did not express any personal fear or describe any behavior perceived as threatening to Gilliver. Without more, the circumstances here do not indicate that conscious or unconscious bias lessened the reliability of Gilliver's tip.

The city points to additional reliability factors based on Gilliver's statements and demeanor when Officer BrinJones arrived, though these occurred *after* he had already made his 911 call and are largely irrelevant to its reliability. The city does not appear to argue that Gilliver's brief exclamations constituted a second tip, and our reliability analysis properly focuses on the circumstances of Gilliver's 911 call at the time it was made.

Police may also confirm the reliability of a tip through corroboration, either by independently observing the reported criminal activity or by observing that the informant obtained the information in their tip in a reliable fashion. *Z.U.E.*, 183 Wn.2d at 618. Corroboration of merely innocuous facts, such as a suspect's appearance, is insufficient. *Id.* at 623. The city points to three independent observations that Officer BrinJones made of Stearns's driving that corroborate the alleged crime of DUI: Stearns nearly crossing the center line, Stearns nearly hitting a curb and then jerking his truck to the right as he exited the roundabout, and Stearns's speeding and speed fluctuation. Under the totality of the circumstances test, we must consider these observations in the aggregate, rather than take a "divide-and-conquer" approach. *See Howerton*, 187 Wn. App. at 374.

Observations of driving behavior are certainly relevant, and "erratic behaviors" such as crossing the center line and weaving side to side can be probative of DUI. *Navarette*, 572 U.S. at 402; *see also, e.g.*, *State v. Anderson*, 51 Wn. App. 775, 776, 755 P.2d 191 (1988). Speeding alone is not typically probative of DUI, particularly if the driver is only slightly over the speed limit. *See Navarette*, 572 U.S. at 402. However, speeding and speed fluctuation can be considered as part of the totality of the circumstances providing reasonable suspicion of DUI. *See id.* (citing Nat'l Highway Traffic Safety Admin., U.S. Dep't of Transp., The Visual Detection of DWI Motorists 4-5 (Mar. 2010), http://nhtsa.gov/staticfiles/nti/pdf/808677.pdf). We conclude that Officer BrinJones's three observations of Stearns's erratic driving, taken together, provided some corroboration of Gilliver's report of DUI.

The city also argues that Officer BrinJones was able to confirm, through her contact with Gilliver in the parking lot, that Gilliver gathered his information in a reliable fashion. Based on the extremely short time it took for Officer BrinJones to arrive after the 911 call and Gilliver's almost immediate exclamation when he pointed to Stearns driving away, it was reasonable for her to conclude that Gilliver was the caller. *See State v. Bell*, No. 76511-6-I, slip op. at 11 (Wash. Ct. App. Dec. 3, 2018) (unpublished) (finding law enforcement reasonable in assuming that toll booth employee who gestured toward defendant on the scene was the same person

18

who placed 911 call), https://www.courts.wa.gov/opinions/pdf/765116.pdf. The fact that Stearns was just beginning to pull out of the parking lot as BrinJones arrived also made it reasonable for her to infer that Gilliver had just observed his behavior from that vantage point. Of course, she was not on the scene when Gilliver made the 911 call and therefore had no way of observing details such as how close Gilliver was to Stearns or whether his view was unobstructed, which could have strengthened this type of corroboration.

Lastly, as we consider the totality of the circumstances, it is important to include the potential immediate danger of the reported crime. "[T]he seriousness of the criminal activity reported by an informant can affect the reasonableness calculus which determines whether an investigatory detention is permissible." *Sieler*, 95 Wn.2d at 50 (citing *Lesnick*, 84 Wn.2d at 944-45). In *Z.U.E.*, we reaffirmed this principle, although we phrased it as lowering the requirement of reliability for the tip, rather than affecting the overall reasonableness of the stop. 183 Wn.2d at 623. We also noted that *Navarette* "largely turn[ed] on this factor. Drunk drivers pose a threat to everyone on the road, and officers must be able to take action to prevent a potentially imminent accident." *Id.* at 624. Still, potential immediate danger to the public is not a "substitute for a reliable informant." *Vandover*, 63 Wn. App. at 760 (holding stop unlawful despite seriousness of person brandishing shotgun due to no indicia of reliability in tip); *see also Campbell v. Dep't of Licensing*, 31 Wn. App.

833, 837, 644 P.2d 1219 (1982) (holding stop unlawful despite seriousness of DUI due to insufficient factual basis of tip).

We hold that the totality of the circumstances indicate that Gilliver's tip was reliable. Gilliver was a citizen informant who used the 911 system to give an eyewitness account contemporaneous with events indicating an active DUI. The circumstances do not indicate that Gilliver's call was malicious and fraudulent, nor that conscious or unconscious bias played a role in his perception of Stearns's behavior or his decision to call 911. We need not decide today whether the *Navarette* majority or dissent approach is more consistent with Washington law; here, the totality of the circumstances indicate reliability under either approach. Taken together, Officer BrinJones's three observations of Stearns's driving also corroborated Gilliver's allegation that Stearns was intoxicated. The nature of the offense, DUI, posing a serious risk to the public and requiring a swift response, also supports allowing law enforcement to act on the reliability of the tip.

II. Gilliver's observations of Stearns "staggering all around the place" and driving his truck in the parking lot, combined with Officer BrinJones's observations of Stearns's driving, provided a sufficient factual basis for reasonable suspicion of DUI

Even when a reliable tip alleges a crime posing an imminent danger to the public, police must also have a sufficient factual basis to form reasonable suspicion of that crime. When a tip is reliable, that means only that the officer can treat the facts communicated in the tip as true, as if the officer observed the facts personally.

20

Those facts, combined with any of the officer's own observations, must still give rise to a reasonable suspicion that criminal activity is occurring in order to justify the officer's decision to execute a *Terry* stop.

Reasonable suspicion does not require an officer to be completely certain of criminal activity before making an investigative stop. "*Terry* accepts the risk that officers may stop innocent people." *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); *see also Stearns*, No. 38981-2-III, slip op. at 15 ("Officer BrinJones was not required to rule out all innocent explanations for Mr. Stearns's conduct." (citing *Anderson*, 51 Wn. App. at 780)). While the State bears the ultimate burden of proving that a warrantless seizure is lawful, a *Terry* stop requires only reasonable suspicion, which is less than the probable cause needed for an arrest or warrant and significantly less than the burden of proof at trial. We have described reasonable suspicion as "a substantial possibility that criminal conduct has occurred or is about to occur." *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986).

Most cases analyzing reasonable suspicion of DUI involve observations of the defendant's driving. *See, e.g., Anderson*, 51 Wn. App. 775 (finding weaving side to side gave reasonable suspicion of DUI). Courts have analyzed fewer cases involving direct observations of the defendant's demeanor and bodily movements immediately before and after driving, which are also relevant. For example, in *State v. Mecham*,

we held that an officer had reasonable suspicion of DUI when he "smelled intoxicants on Mecham's breath and noticed that Mecham's movements were sluggish and that his speech was slurred and repetitive." 186 Wn.2d 128, 138-39, 380 P.3d 414 (2016) (plurality opinion).

While it is not necessary to rule out all innocent causes of behavior, courts should keep in mind other circumstances that could cause a person to stagger, appear sluggish, or slur their speech besides the influence of drugs or alcohol. For example, a person observed staggering could be experiencing some temporary loss in balance or could have a medical condition or disability affecting their motor control and gait. Courts must be conscious of the history of police brutality against people with disabilities, often due to misconstruing elements of their disability as aggression, defiance, or resisting arrest. *See, e.g.*, *Interacting with Police If You Have a Disability*, POLICE BRUTALITY CTR. (Mar. 3, 2025), https://policebrutalitycenter.org/interacting-with-police-if-you-have-a-disability/. Courts must also recognize that because Black, Indigenous, and other People of Color are subjected to investigative stops at disproportionately higher rates than white people, they are most at risk of having their innocent actions misconstrued for crimes and having a brief stop escalate to a violent altercation. *See State v. Sum*, 199 Wn.2d 627, 644, 511 P.3d 92 (2022). This risk is naturally compounded at the intersection of race and disability. *See* Abigail Abrams, *Black, Disabled and at Risk:*

22

*The Overlooked Problem of Police Violence Against Americans with Disabilities*, TIME (June 25, 2020, 8:56 AM), https://time.com/5857438/police-violence-black-disabled/ [https://perma.cc/J7LG-362P]. Even if a quick breath sample or field sobriety test could exonerate an innocent driver pulled over for DUI, courts should not downplay the fear, harm, and risk of escalation that comes with any seizure by police, no matter how brief. Courts must carefully examine the full arc of facts in each case—from the moment the tip is communicated to the moment the investigative stop is initiated—in the context of these systemic biases.

Stearns relies heavily on *Z.U.E.*, but the alleged crime at issue and the observed facts here distinguish this case from *Z.U.E.* Gilliver called 911 to report a highly intoxicated person about to drive out of a parking lot. Discerning whether a person is intoxicated is unlike determining whether a person seen in possession of a firearm is 17 versus 18 years old, as in *Z.U.E.* The average adult in the United States is generally aware of the effects of alcohol, and staggering while attempting to walk is one of the clearer signs of significant impairment. A report that a person is "staggering all around the place" suggests more than poor balance, and given the accessibility of alcohol to adults, this behavior raised a substantial possibility that Stearns was intoxicated.

Gilliver described two discrete instances of Stearns's apparently intoxicated behavior, both before and after driving his truck within the parking lot. Officer

BrinJones also observed three discrete instances of erratic driving, more than the single incident that was sufficient for reasonable suspicion of DUI in *Navarette*. The facts offer far more here than in *Z.U.E.* After carefully examining the totality of the circumstances, we conclude that Gilliver's tip, corroborated by Officer BrinJones's observations, provided a sufficient factual basis to stop Stearns on reasonable suspicion of DUI.

## CONCLUSION

Law enforcement officers may effectuate a *Terry* stop based on a 911 caller's tip when the tip is reliable and contains a factual basis for reasonable suspicion of a crime. Both parts of the test are met here, because Gilliver's report of an active DUI was made under circumstances indicating reliability, Officer BrinJones's observations of erratic driving corroborated the allegations, and those observations combined with the facts communicated in the tip provided a sufficient factual basis for reasonable suspicion of DUI. Because the stop of Stearns's vehicle was lawful, we reverse the Court of Appeals and reinstate Stearns's convictions.

24

Stephens, C.J.

WE CONCUR:

Johnson, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Gordon McCloud, J.

Toynbee, J.P.T.

No. 102680-3

WHITENER, J. (concurring)— I join the majority in its result as to the specific facts of this case. I write separately to highlight the missed opportunity presented here to address the limitations of our reliance on an outdated and unrealistic view of analyzing the indicia of reliability of a "citizen informant's" 911 tip. Our state has a long history as a leader in protecting the privacy rights of its citizens. The protections guaranteed by article I, section 7 of our state constitution are "qualitatively different from those provided by the Fourth Amendment to the United States Constitution." *State v. McKinney*, 148 Wn.2d 20, 26, 60 P.3d 46 (2002). Our state constitution provides greater protection. *Id*. The legal underpinning regarding how we analyze the reliability of "citizen informants" for *all* of Washington's citizens is squarely before us. Unfortunately, the majority continues to see the use of 911 calls as premised on a desire of a citizen informant to be helpful or to help improve public safety. Today, 911 calls are routinely misused in furtherance of illegitimate purposes that are often grounded in racial and ethnic animus or even revenge. Unlike the majority, I believe citizen informants can no longer be deemed "'presumptively reliable'" just because they call 911. Majority at 11 (quoting *State v. Gaddy*, 152 Wn.2d 64, 73, 93 P.3d 872 (2004)).

There are numerous instances, far too many, where the use of 911 calls are weaponized on Black, Indigenous, and People of Color (BIPOC), "where police are functioning as personal racism concierges."[1] Specifically, it is seen where citizen informants determine that BIPOC do not belong in certain spaces and these citizen informants use 911 calls to summon the police to inconvenience, harass, or imperil BIPOC for simply living their lives.[2] A review of these incidents makes clear that these 911 citizen informants are unconcerned about any repercussions for spreading nefarious falsehoods about persons perceived to be different. Traditional indicia of reliability referenced in the majority opinion are no longer applicable. Today, 911 callers generally use their own phones to call into the 911 emergency system (exhibiting no fear that police can readily trace the calls), enthusiastically and truthfully identify themselves, purportedly as eyewitnesses or victims, remain on the scene, and contemporaneously report falsely about the encounter.

---

[1] Janell Ross, *Segregation Now: #LivingWhileBlack Experiences Are the New Version of 'Whites Only' Signs*, NBC NEWS (May 31, 2019, 7:56 AM), https://www.nbcnews.com/news/nbcblk/segregation-now-livingwhileblack-experiences-are-new-version-whites-only-signs-n1012226 [https://perma.cc/HMK5-4T2E].

[2] *Supra* note 1; *see also* John Blake, *How 911 Calls on Blacks Are a New Twist on Something Old: White Flight*, CNN (Aug. 10, 2018), https://edition.cnn.com/2018/08/10/us/white-flight-911-calls/index.html [https://perma.cc/A3VL-B45U]; Brandon Griggs, *Living While Black*, CNN (Dec. 28, 2018, 8:37 AM), https://www.cnn.com/2018/12/20/us/living-while-black-police-calls-trnd/index.html [https://perma.cc/S94A-KK3V]; Elijah Anderson, *Black Americans Are Asserting Their Rights in "White Spaces." That's When Whites Call 911*, VOX (Aug. 10, 2018, 6:00 AM), https://www.vox.com/the-big-idea/2018/8/10/17672412/911-police-black-white-racism-sociology [https://perma.cc/E5RR-QCLR]; Rachael Herron, *I Used To Be a 911 Dispatcher. I Had To Respond to Racist Calls Every Day*, VOX (Oct. 31, 2018, 9:08 AM), https://www.vox.com/first-person/2018/5/30/17406092/racial-profiling-911-bbq-becky-living-while-black-babysitting-while-black [https://perma.cc/9RP2-TSG8].

- Playing golf too slow[3]

- Two students on college tour[4]

- Security officer eating tortilla chips and a burrito in the park[5]

- Yale student napping in a dorm[6]

- Invited to swim[7]

- Inspecting a house to purchase[8]

- Sitting at Starbucks waiting for a friend[9]

- 12-year-old kid mowed the wrong lawn[10]

- Shopping at Nordstrom Rack[11]

- Firefighter performing routine inspections[12]

---

[3] Tony Marco & Lauren DelValle, *A Group of Black Women Say a Golf Course Called the Cops on Them for Playing Too Slow*, CNN (April 25, 2018, 5:21 PM), https://www.cnn.com/2018/04/25/us/black-women-golfers-pennsylvania-trnd/index.html [https://perma.cc/E2NY-X8PJ].

[4] Dakin Andone & Hollie Silverman, *A Mom on a College Tour Called the Cops on Two Native American Teens Because They Made Her 'Nervous'*, CNN (May 5, 2018, 3:13 PM), https://www.cnn.com/2018/05/04/us/colorado-state-university-racial-profiling-trnd/index.html [https://perma.cc/K7TU-QB5Z].

[5] Rebecca Solnit, *Death by Gentrification: The Killing That Shamed San Francisco*, GUARDIAN (Mar 21, 2016, 1:38 PM), https://www.theguardian.com/us-news/2016/mar/21/death-by-gentrification-the-killing-that-shamed-san-francisco [https://perma.cc/8JNT-9U44].

[6] Holly Yan, *Yale Student Accused of 'Napping While Black' Wants Fellow Student Disciplined*, CNN (May 14, 2018, 1:27 PM), https://www.cnn.com/2018/05/14/us/yale-black-grad-student-interview/index.html [https://perma.cc/7NAV-368U].

[7] Maya Eliahou & Christina Zdanowicz, *A White Woman Allegedly Hit a Black Teen, Used Racial Slurs and Told Him To Leave a Pool. Then She Bit a Cop*, CNN (June 29, 2018, 7:08 PM), https://www.cnn.com/2018/06/29/us/pool-patrol-paula-south-carolina-trnd/index.html [https://perma.cc/7N8Z-PSHY].

[8] Doug Criss, *A White Woman Sees a Black Man Inspecting a House and Calls the Cops. But There's a Twist to This Incident*, CNN (May 16, 2018, 12:56 PM), https://www.cnn.com/2018/05/16/us/investor-memphis-police-trnd/index.html.

[9] Alex Horton, *Starbucks CEO Apologizes After Employee Calls Police on Black Men Waiting at a Table*, WASH. POST (Apr. 15, 2018), https://www.washingtonpost.com/news/business/wp/2018/04/14/starbucks-apologizes-after-employee-calls-police-on-black-men-waiting-at-a-table/.

[10] David Williams, *Neighbor Calls Police on a 12-year-old Boy for Mowing the Wrong Lawn*, CNN, (July 1, 2018, 5:05 PM), https://www.cnn.com/2018/07/01/us/police-called-lawn-mowing-boy-trnd/index.html [https://perma.cc/PB26-HA69].

[11] Bill Hutchinson, *Nordstrom Rack President Apologizes to 3 Black Youths Wrongly Accused of Shoplifting*, ABC NEWS (May 8, 2018, 4:01 PM), https://abcnews.go.com/US/nordstrom-rack-president-apologizes-black-youths-wrongly-accused/story?id=55011518 [https://perma.cc/25HW-KHLA].

[12] Dan Simon, *Oakland Resident Reports Black Firefighter to Police During Routine Inspection*, CNN (June 28, 2018, 9:04 AM), https://www.cnn.com/2018/06/27/us/oakland-firefighter-racial-profiling/index.html [https://perma.cc/XZH4-3UYM].

- Trying to cash his paycheck[13]

- Trying to open his own store[14]

- Hotel guest takes a phone call in the hotel lobby[15]

- 9-year-old boy's backpack touched her[16]

- College student eating lunch[17]

- Campaigning for political office[18]

- Helping a homeless man[19]

- They did not wave or smile[20]

- Babysitting[21]

- Shopping while 34-weeks pregnant[22]

---

[13] Andrea Diaz & Amanda Watts, *Staff at a Bank in Ohio Called Police on a Black Man Trying To Cash His Paycheck*, CNN (Dec. 20, 2018, 7:40 AM), https://www.cnn.com/2018/12/19/us/cleveland-man-alleges-racial-profiling-at-huntington-bank-trnd/index.html [https://perma.cc/SX4F-WFPE].

[14] Dan Simon & Susannah Cullinane, *Police Called on Black Man Opening His Own Business*, CNN (July 23, 2018, 8:09 PM), https://www.cnn.com/2018/07/23/us/san-francisco-lemonade-gourmonade/index.html [https://perma.cc/CS62-DZQB].

[15] Keith Allen, *Hotel Employees Who Asked Black Guest To Leave Fired*, CNN (Dec. 29, 2018, 4:54 PM), https://www.cnn.com/2018/12/28/us/portland-hotel-police-black-guest-trnd/index.html [https://perma.cc/ND5S-FV5Q].

[16] Khristina Narizhnaya, *'Cornerstore Caroline' Oughta Be Mortified Right About Now*, N.Y. POST (Oct. 12, 2018, 4:46 PM), https://nypost.com/2018/10/12/the-moment-a-kids-backpack-got-him-accused-of-sexual-assault/ [https://perma.cc/UT3E-LF2X].

[17] Nicole Chavez & Sophia Lipp, *Smith College Student Who Was Racially Profiled While Eating Says the Incident Left Her So Shaken She Can't Sleep*, CNN (Aug. 3, 2018, 2:33 PM), https://www.cnn.com/2018/08/03/us/smith-college-student-police-trnd/index.html [https://perma.cc/NJF4-S4EX].

[18] David Williams, *Someone Called Police on an African-American Politician While She Campaigned in Her Wisconsin District*, CNN (Sept. 21, 2018, 9:22 AM), https://www.cnn.com/2018/09/20/us/wisconsin-candidate-police-trnd/index.html [https://perma.cc/4HGU-FWNN].

[19] David Williams, *Woman Says Supermarket Called Police on Her While She Was Helping a Homeless Man*, CNN (Aug. 2, 2018, 1:42 PM), https://www.cnn.com/2018/08/01/us/police-called-on-good-samaritan-trnd/index.html [https://perma.cc/G47W-YVCW].

[20] Dakin Andone, *Woman Says She Called Police When Black Airbnb Guests Didn't Wave at Her*, CNN (May 11, 2018, 2:32 AM), https://www.cnn.com/2018/05/10/us/airbnb-black-rialto-california-trnd/index.html [https://perma.cc/8985-JY86].

[21] Chris Harris, *Black Man Caring for 2 White Children Stopped by Cops After Woman's Call: 'Babysitting While Black'*, PEOPLE (Oct. 9, 2018, 4:15 PM), https://people.com/crime/babysitting-while-black-woman-calls-police-man-babysitting-white-kids/ [https://perma.cc/P2BU-8BPB].

[22] Natalie O'Neill, *Cop Humiliates Pregnant Woman, Accuses Her of Shoplifting*, N.Y. POST (Aug. 13, 2018, 3:48 PM), https://nypost.com/2018/08/13/cop-humiliates-pregnant-woman-accuses-her-of-shoplifting/ [https://perma.cc/5G4A-8AE5].

- Wearing socks in community pool[23]

- Installing their backyard patio [24]

- Moving into his own apartment[25]

- Barbecuing at the lake[26]

- Opening business accounts at a bank[27]

- Withdrawing money from his bank account[28]

- They were happy and she was sad[29]

- 11-year-old boy with a paper route[30]

- Asked for return of their charger [31]

- Birdwatching in the park[32]

---

[23] N'dea Yancey-Bragg, *Woman Fired After Calling the Police on a Black Man for Wearing Socks in Community Pool*, USA TODAY (July 17, 2018, 5:55 PM), https://www.usatoday.com/story/news/nation-now/2018/07/08/woman-fired-called-cops-black-man-socks-pool/766467002/ [https://perma.cc/6S5W-537W].

[24] Kemberly Richardson, *Black Couple from New Jersey Speaks Out After Neighbor Calls Police on Them*, ABC7 CHICAGO (July 2, 2020), https://abc7chicago.com/montclair-monclair-dispute-neighbor-confrontation-white-confronts-couple/6292198/ [https://perma.cc/AB2K-UYMW].

[25] Holly Yan, *This Is Why Everyday Racial Profiling Is So Dangerous*, CNN (May 11, 2018, 11:54 AM), https://www.cnn.com/2018/05/11/us/everyday-racial-profiling-consequences-trnd/index.html [https://perma.cc/9DWY-NMTQ].

[26] Christina Zhao, *'BBQ Becky,' White Woman Who Called Cops on Black BBQ, 911 Audio Released: 'I'm Really Scared! Come Quick!'*, NEWSWEEK (Oct. 12, 2018, 3:11 PM), https://www.newsweek.com/bbq-becky-white-woman-who-called-cops-black-bbq-911-audio-released-im-really-1103057 [https://perma.cc/PUM5-RBY4].

[27] Carlos Miller, *'No. You Cannot!': White Employee Calls Police on Black Man After Denying His Request To Open Business Accounts at Commerce Bank, Lawsuit Says*, ATLANTA BLACK STAR (Dec. 10, 2024), https://atlantablackstar.com/2024/12/10/black-man-sues-commerce-bank-for-calling-police-when-he-tried-opening-business-account/ [https://perma.cc/QQQ8-YWQV].

[28] Niko Mann, *It Happened Again: Bank Calls Police on Black Man Requesting a Withdrawal from His Own Account: 'I Was Treated as a Criminal'*, ATLANTA BLACK STAR (Jan. 13, 2023), https://atlantablackstar.com/2023/01/13/black-man-files-lawsuit-against-u-s-bank-for-racial-discrimination-in-minnesota/ [https://perma.cc/E7C3-37N2].

[29] Michael Harriot, *Depressed Debbie Calls Police on Black Neighbors Because They Were Happy and She Was Sad*, ROOT (June 6, 2018), https://www.theroot.com/depressed-debbie-calls-police-on-black-neighbors-becaus-1826602734 [https://perma.cc/265L-AW9F].

[30] Joe Setyon, *Neighbor Calls Cops on 11-Year-Old Black Boy with a Paper Route*, REASON (July 11, 2018, 11:00 AM), https://reason.com/2018/07/11/police-summoned-to-deal-with-11-year-old/ [https://perma.cc/C32W-VH57].

[31] Biba Adams, *White Woman Calls 911, Falsely Accuses Black TikTokers of 'Beating' Her*, GRIO (May 12, 2021) https://thegrio.com/2021/05/12/white-woman-black-tiktokers-false-911-call/ [https://perma.cc/SQ5Q-RY3L]

[32] Janelle Griffith, *NYC Officials Call for Police Probe of White Woman's 911 Call on Black Man in Central Park*, NBC NEWS (May 28, 2020, 1:03 PM), https://www.nbcnews.com/news/us-news/nyc-officials-call-police-probe-white-woman-s-911-call-n1216451 [https://perma.cc/4K69-PNZS]; s*ee also* Tim Fitzsimons, *White Woman Who*

5

- Using their gym membership[33]

- At his son's soccer game[34]

- Waiting in his car for yoga class to start[35]

- Trying to deposit his settlement check[36]

- Stenciling a sign on his home[37]

- Trying to use a coupon at CVS [38]

- Watering flowers[39]

- Ordering food[40]

- Walking his baby[41]

---

*Called 911 on Black Birdwatcher Made 2nd Call Saying He Tried To Assault Her*, NBC NEWS (Oct. 14, 2020 10:37 AM), https://www.nbcnews.com/news/us-news/white-woman-who-called-911-black-birdwatcher-made-2nd-call-n1243331 [https://perma.cc/HF3X-B25F].

[33] Darran Simon, *LA Fitness Apologizes After Racial Profiling Allegations at Club*, CNN (April 20, 2018, 11:57 AM), https://www.cnn.com/2018/04/20/us/la-fitness-apology/index.html [https://perma.cc/3G2E-CYWB].

[34] Char Adams, *White Woman Dubbed 'Golf Cart Gail' Calls Cops on Black Father at His Son's Soccer Game*, PEOPLE (Oct. 17, 2018, 4:30 PM), https://people.com/human-interest/golf-cart-gail-woman-black-father-soccer-cops-florida/ [https://perma.cc/C47F-RNKD].

[35] Latifah Muhammad, *White California Woman Calls Cops on Black Man Sitting in His Car Waiting for Yoga Class To Start*, VIBE (July 13, 2018, 10:47 PM), https://www.vibe.com/news/national/white-california-woman-calls-911-black-man-sitting-in-car-596473/ [https://perma.cc/DXH5-UJZL].

[36] Khaleda Rahman, *Bank Calls Cops on Black Man Attempting To Deposit Racial Discrimination Settlement Check from Employer*, NEWSWEEK (Jan. 24, 2020, 6:24 AM), https://www.newsweek.com/bank-calls-cops-black-man-depositing-racial-discrimination-settlement-check-1483681 [https://perma.cc/S9PR-FXTU].

[37] Claire Wang, *Filipino American Confronted for BLM Message Sheds Light on Form of Genteel Racism, Experts Say*, NBC NEWS (June 18, 2020, 10:42 AM), https://www.nbcnews.com/news/asian-america/filipino-american-confronted-blm-message-sheds-light-form-genteel-racism-n1231409 [https://perma.cc/N52J-S55N].

[38] Rachel Siegel, *CVS Employees Call 911 on Black Woman Trying To Use a Coupon*, LA TIMES (July 17, 2018, 8:00 AM), https://www.latimes.com/nation/nationnow/la-na-cvs-coupon-chicago-20180717-story.html [https://perma.cc/F9TY-UCMP].

[39] Natasha Zouves & J.J. Bullock, *Alabama Pastor Calls Arrest While Watering Flowers Racial Profiling*, WHNT NEWS 19 (Aug. 29, 2022, 4:43 PM), https://whnt.com/news/alabama-news/alabama-pastor-calls-arrest-while-watering-flowers-racial-profiling/ [https://perma.cc/9MQ8-53NH].

[40] Cordell Wright, *Escorted Out of a Sioux Falls Denny's: "We just wanted to order some food'*, DAKOTA NEWS NOW (Sep. 4, 2023, 7:21 PM), https://www.dakotanewsnow.com/2023/09/05/escorted-out-sioux-falls-dennys-we-just-wanted-order-some-food/ [https://perma.cc/V527-6SEY].

[41] Angela Helm, *White Woman Calls Security on 'Suspicious Man with a Baby' at Park in Washington, DC*, ROOT (May 16, 2018), https://www.theroot.com/black-father-stopped-by-security-after-white-woman-call-1826082634 [https://perma.cc/JHD6-FXBZ].

There is a lack of accountability to these documented instances of misuse of the 911 system by these 911 "citizen informant" encounters; there is limited, if any, legal repercussions for their actions.[42]

These types of incidents are not new, and, unlike the majority, I do not believe they can be addressed by adding consideration of unconscious bias to the totality of the circumstances. The majority fails to understand that these incidents are manifestations of unconscious bias and therefore are examples of explicit bias. A broader holding is required. We use technology in every part of our daily lives, and we know more about the misuses of the 911 system by "citizen informants" because they are now reported in real time with the use of technology that is now in our hands. The phones of yesterday have given way to the "minicomputers" in our hands today called cell phones. We are aware of this misuse of the 911 systems because of the popularity of social media platforms, the expansive reach of the Internet and the increased prevalence of "citizen journalists."[43] These widely publicized incidents

---

[42] W. Stan Crowder & Brent E. Turvey, *False 9-1-1 Calls*, in FALSE ALLEGATIONS - INVESTIGATIVE AND FORENSIC ISSUES IN FRAUDULENT REPORTS OF CRIME 65, 67-68 (Brent E. Turvey et al. ed., 2018) (discussing that despite false reports to 911 being so prevalent and being a crime that is punishable by law, "[n]ot all law enforcement agencies understand this, and not all treat false reporters in this fashion, though they are required to"); s*ee, e.g.*, Becca Longmire, *Woman Called 911 Nearly 400 Times for 'Nonexistent Emergencies,' Once Resulting in Man's Death: 'Serial Abuse'*, PEOPLE (July 18, 2024, 4:30 PM) (highlighting that Kesha S. Kennedy placed 400 false 911 calls between 2020 and 2024 before any legal consequences), https://people.com/woman-called-911-hundreds-times-nonexistent-emergencies-pleads-guilty-8679951 [https://perma.cc/XQ62-6J6Q].
[43] Dave Roos, *What Is Citizen Journalism?*, HOWSTUFFWORKS, https://people.howstuffworks.com/citizen-journalism.htm [https://perma.cc/JM96-XHLE].

refute the notion that the "citizen informant" is a person who is only focused on reporting actual criminal behavior for the good of the community.

The majority states that the statements in *State v. Lesnick*, 84 Wn.2d 940, 530 P.2d 243 (1975), and *State v. Sieler*, 95 Wn.2d 43, 621 P.2d 1272 (1980), should be considered in historical context. Majority at 11. I agree. The historical context of the 911 system should include why it came into being. It was to "assist government authorities in planning their response to civil disorder."[44] This effort came in the wake of the civil rights protests and was largely driven by the Kerner Report's *Supplement on Control of Disorder*.[45]

The factors used in our precedent supported a 911 citizen informant who no longer exists for many people. Today, a broad approach is needed to include these experiences. Therefore, to establish reasonable suspicion under a totality of the circumstances test, the informant tip must have both a factual basis *and* a basis of knowledge requirement. The majority believes only the former is required and that the latter "need not be shown." Majority at 10. This distinction the majority makes between "factual basis" and the "basis of knowledge" in establishing reasonable suspicion is not broad enough to protect BIPOC from the realities of the present use

---

[44] NAT'L ADVISORY COMM'N ON CIV. DISORDERS, REPORT OF THE NATIONAL ADVISORY COMMISSION ON CIVIL DISORDERS 9, https://www.hud.gov/sites/dfiles/FHEO/documents/kerner_commission_full_report.pdf.
[45] *Id.* at 268-69.

of the 911 system by an increasing number of "citizen informants." *Id*. at 9-10.

Under a totality of the circumstances test, however, how the tipster gathered their

facts is extremely relevant. To protect our privacy interest, article I, section 7 of the

Washington State Constitution requires that the informant's tip bears *sufficient*

indicia of reliability under the totality of the circumstances to support a stop. *State*

*v. Z.U.E.*, 183 Wn.2d 610, 617-19, 352 P.3d 796 (2015). It requires a stronger

showing by the State as to what constitutes reasonable suspicion. *Id*.

Washington's constitution provides that "[n]o person shall be disturbed in his

private affairs, or his home invaded, without authority of law." WASH. CONST. art.

I, § 7. "Private affairs" means that in Washington, a person's right to privacy is

extensive, and the circumstances under which those privacy rights can be disturbed

is not built on a bedrock of reasonableness but is instead allowed only under the

authority of law. *State v. Snapp*, 174 Wn.2d 177, 194, 275 P.3d 289 (2012). Thus,

a police officer responding to an informant tip regarding a possible crime in progress

and interacting with or interrogating the "suspect" could constitute authority of law,

provided that the informant's tip has some "indicia of reliability." *State v. Saggers*,

182 Wn. App. 832, 840, 332 P.3d 1034 (2014). The reliability, veracity, and basis

of knowledge of an informant are highly relevant considerations in the totality of the

circumstances analysis. *Illinois v. Gates*, 462 U.S. 213, 230-33, 103 S. Ct. 2317, 76

L. Ed. 2d 527 (1983). In assessing reliability, courts require evidence of either "(1) circumstances establishing the informant's reliability *or* (2) some corroborative observation, usually by the officers, that shows either (a) the presence of criminal activity or (b) that the informer's information was obtained in a reliable fashion." *Z.U.E.*, 183 Wn.2d at 618 (emphasis added).

Here, Frank Stearns sustained a *Terry*[46] stop on the basis of a 911 tip given by a citizen informant who identified himself as David Gilliver. According to the majority, the facts that support indicia of reliability are Gilliver provided his name during the 911 call, so he was an identified caller. Majority at 13. "Known citizen informants are generally presumed to be reliable." *Saggers*, 182 Wn. App. at 840. Officer Natalie BrinJones responded to the parking lot of Cascade Motorsports within minutes of the call. Gilliver's call was the "sort of contemporaneous report [that] has long been treated as especially reliable." *Navarette v. California*, 572 U.S. 393, 399-400, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014); majority at 13. However, even assuming that those are solid and reasonable indicators of a 911 caller's veracity, *Navarette*'s remaining logic, cited approvingly by this court in *Z.U.E*, that a caller's use of the 911 system is itself an indicator of reliability, has not held up

---

[46] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

under the weight of recent history and should be disavowed. *Z.U.E.*, 183 Wn.2d at 621-23.

In *Navarette*, the United States Supreme Court noted that while technological and regulatory developments around the 911 system do not make 911 calls *per se* reliable, those developments are still relevant to the extent that a police officer concludes that the person calling in a tip would not use the system fraudulently. 572 U.S. at 401. This logic is flawed at best, dangerous at worst. First, as shown by the few instances I have identified, it is a mistake to make any assertion or draw any conclusion regarding the reliability of a citizen informant merely because of their use of the 911 system. Second, to protect an individual's privacy interest in these circumstances, the presumption that law enforcement can reliably assess the totality of the circumstances upon receiving information from a citizen informant *requires* the officer know "how the tipster gathered their facts, such as through their own senses (e.g. sight, sound, smell) or through a particular means or intermediary (e.g. eavesdropping, looking through binoculars or at the reflection in a mirror, hearing from a friend)." Majority at 10. Third, the advancement of the use of technology is broader than stated by the majority, or by Stearns and the Washington Association of Criminal Defense Lawyers (WACDL) in their amicus briefing. The issue is not as limited as Stearns and WACDL argue. It is not just that a call "made to the

emergency line has no bearing on its reliability because callers are unaware of the technological advancements behind modern 911 systems," that the 911 call is more reliable "because callers know that technology can identify them and that they can be held accountable for false statements," or that "this reliability is undermined by the possibility that a caller will borrow or steal another person's device to make the 911 call." Majority at 12. Nor is it, as the majority states, that their arguments "highlight important questions about how much the average person knows about 911 technology or how often people use other's phones to report crimes." *Id*. at 13. Advancements in technology are so far evolved that anyone can misuse the 911 call system to spoof or fake 911 calls. In fact, as early as 2008, six years prior to *Navarette*, the FBI warned us about the misuse of technology to make fraudulent 911 calls and that fake callers "have no trouble convincing 9-1-1 operators they are telling the truth."[47]

Stearns' case is not about fraudulent calls; but with what we know today, this case raises the validity of the analytical rubric we use in assessing the reliability of a citizen informant tip made using the 911 system. The indicia of reliability the 911

---

[47] *The Crime of 'Swatting': Fake 9-1-1 Calls Have Real Consequences*, FBI (Sep. 3, 2013), https://www.fbi.gov/news/stories/the-crime-of-swatting-fake-9-1-1-calls-have-real-consequences1; *Don't Make the Call: The New Phenomenon of 'Swatting'* FBI (Feb. 4, 2008), https://archives.fbi.gov/archives/news/stories/2008/february/swatting020408; s*ee also* CROWDER & TURVEY, *supra*, at 81-83.

system once had is no longer valid. The 911 system is weaponized to place calls on noncriminal behavior specifically of Black, Indigenous and Brown people. The majority's dismissive approach to the explicit bias faced by BIPOC people misses an opportunity to provide greater protections as envisioned in our state constitution for all of Washington's citizens. In fact, without a broad approach, the existing standards necessary for reasonable suspicion have been lessened to such a degree for BIPOCs where a 911 caller can say virtually anything and with no factual basis shown, police can invade some Washington citizen's privacy. It is truly about "our evolving understanding of human behavior, which necessarily informs the reasonable inference to be drawn." Majority at 14. What we know today, is the use of the 911 system should not be relied on as an indicator or inference of a citizen informant's reliability.

The law accepts the risk that police may stop innocent people. *See Terry*, 392 U.S. at 22. However, for some in our society, these encounters can be life or death. The dynamics of race/ethnicity, crime, and policing are complex, and interactions between BIPOC and the police are embedded in a lengthy problematic history that

continues even after the person has been deemed innocent of the conduct attributed to them by the 911 caller.[48]

It is true, Stearns is not a BIPOC, and as the facts here show, Gilliver's 911 call was not grounded in anything but a desire to do the right thing. Also, it appears that the observations of Stearns' driving by Officer BrinJones could provide a sufficient factual basis for this DUI. However, that is a "twenty- twenty hindsight" review of the facts on this very important issue. This case provides us with an opportunity to reevaluate how we analyze the reliability of a 911 call by a citizen informant, where that call could quickly escalate from a minor privacy intrusion to one that results in the loss of a person's freedom or their life.

"Our laws are not frozen into immutable form, they are constantly in the process of revision in response to the needs of a changing society." *Richardson v. Ramirez*, 418 U.S. 24, 82, 94 S. Ct. 2655, 41 L. Ed. 2d 551 (1974) (Marshall, J.,

---

[48] *See, e.g.*, Kevin J. Strom & Sean Wire, *The Impact of Police Violence on Communities: Unpacking How Fatal Use of Force Influences Resident Calls to 911 and Police Activity*, 9, RTI INTERNATIONAL (2024), https://www.rti.org/rti-press-publication/impact-police-violence-communities-unpacking-fatal-use-force-influences-resident-calls-911-police-ac; Laura Conaway, *Harvard Prof Arrested; Gates Tried to Get Into Own House*, NPR (July 20, 2009, 5:37 PM) (Professor Gates was arrested after providing proof to the police that he was in his own home and not breaking and entering. His expression of outrage led to a disorderly conduct charge that was later dismissed), https://www.npr.org/sections/thetwo-way/2009/07/black_harvard_prof_arrested_ga.html [https://perma.cc/FZJ3-6TW7]; Donald E. Wilkes Jr., *The Arrest of Henry Louis Gates, Jr.*, POPULAR MEDIA 82 (2010), https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1083&context=fac_pm; Editors, *The Gates Case and Racial Profiling*, N.Y. TIMES (July 22, 2009, 7:48 PM), https://archive.nytimes.com/roomfordebate.blogs.nytimes.com/2009/07/22/the-gates-case-and-racial-profiling/ [https://perma.cc/L4GN-JMZL].

dissenting). Technology has advanced by leaps and bounds, but human nature has not. Racism and prejudice should have no place in a civilized society, but still their hold lingers. We should therefore acknowledge the fact that numerous citizen informants are using today's technology, specifically the 911 system, to cause harm. This means that to protect all members of our state, under our constitution we must reassess the indicia used to assess the reliability of a 911 informant. We should require both a factual basis and a basis of knowledge by police officers before there are intrusions into a person's privacy. Accordingly, I respectfully concur in the result.

_____
Whitener, J.

_____
González, J.

15